UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br> *Plaintiff*,<br><br>v.<br><br>$465,789.31 SEIZED FROM TERM LIFE<br>INSURANCE POLICY NO. PJ 108 002 588<br>IN THE NAME OF ROBERT E. LEE, JR.<br>AT AXA EQUITABLE LIFE INSURANCE<br>COMPANY, NEW YORK, NEW YORK,<br> *Defendant*. | No. 3:15-cv-1353 (JAM) |

[Claimant: CATHY L. LEE]

**ORDER GRANTING IN PART AND DENYING IN PART
GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**

  The Government seeks forfeiture of life insurance proceeds that it alleges are traceable to acts of money laundering and wire fraud. Although I agree that the Government has established grounds to forfeit at least some portion of these life insurance proceeds, I conclude that genuine issues remain concerning the extent to which any additional forfeiture is warranted. Accordingly, I will grant in part and deny in part the Government's motion for summary judgment.

**BACKGROUND**

  Robert E. Lee, Jr., was an investment advisor who stole much of his client's money rather than investing it as he had promised them. *See United States v. $465,789.31 Seized From Term Life Ins.,* 150 F. Supp. 3d 175, 176 (D. Conn. 2015). The FBI eventually caught on to him, and Lee pleaded guilty before me in December 2014 to five counts of wire fraud, in violation of 18 U.S.C. § 1343. *See United States v. Lee*, 3:14cr201 (JAM). I sentenced him in March 2015 to 63

months in prison as well as to orders of criminal forfeiture and restitution in the amount of $1,150,815.57.

Lee then appealed his sentence, but he died from cancer during the pendency of the appeal. By operation of law, Lee's death while the appeal was still pending required the vacatur of his conviction and the abatement of his orders of criminal forfeiture and criminal restitution, all without prejudice to the right of the Government to pursue civil forfeiture. *See United States v. Lee*, 2017 WL 125012 (D. Conn. 2017).

Because Lee's conviction has been vacated, I do not rely on the fact of his (now non-existent) conviction to conclude that Lee engaged in wire fraud. Instead, the undisputed facts agreed to by the parties are enough to conclude that Lee committed wire fraud by taking money on false pretenses from his investors and then using the money either for his own personal expenses or to engage in Ponzi scheme payments to other investors to attract new rounds of investment money. *See, e.g.,* Doc. #48-2 at 2-9 (¶¶ 7-34).

Some years before he began defrauding his clients, Lee bought a $1 million life insurance policy in April 2008. Lee's spouse—claimant Cathy Lee—was designated as the sole beneficiary under the policy. Lee paid monthly policy premiums of $379.22 for seven years from April 2008 to April 2015 when he died. Doc. #48-2 at 2 (¶ 4), 14 (¶ 7), 21 (¶ 42).

Most of these premiums were paid from the same personal bank account at Citibank that Lee used beginning in December 2011 for his investor fraud. From December 2011 to October 2013, the Citibank account received $1,081,055.08 in fraud funds from Lee's victims. *Id.* at 8 (¶ 22).[1] Lee recycled more than $1 million in payments from this account to his victims from

---

[1] Claimant's briefing alleges that "the earliest claim the Government makes that Lee deposited investor funds into his Citibank account is November 19, 2012 and the latest is October 29, 2013, a period of 11 months." Doc. #48-1 at 3. This statement is not accompanied by any citation to the record and is contradicted by claimant's admission in the local rule statement of material facts that "[f]rom December 2, 2011 through October 23, 2013, victim funds totaling

November 2011 to April 2014, while drawing down more than $500,000 from this account over this same time period for personal expenditures. *Id.* at 9 (¶ 34).

In the meantime, the Citibank account was also laden with a large amount of legitimate funds. According to Lee (and not contradicted by the Government), he deposited approximately $2,250,000 in legitimate compensation from his employment into the account from December 2007 to July 2013. Doc. #48-2 at 19 (¶ 31).

After April 2014, Lee continued to pay premiums for the life insurance from a new bank account at Wells Fargo until his death in April 2015. *Id.* at 21 (¶¶ 40-42). There is no evidence that the Wells Fargo bank account received any funds relating to any criminal activity.

In short, the undisputed factual record shows that Lee paid monthly policy premiums over the course of seven years from April 2008 to April 2015 for the life insurance policy. It further shows that at least half of these premiums were paid from the Citibank or Wells Fargo accounts at times that they did *not* contain any tainted funds (April 2008 to November 2011 and May 2014 to April 2015).

Even for those months where there were tainted investor funds in the Citibank account (December 2011 to April 2014), the Government's statement of material facts leaves it unclear whether each one of the monthly policy premiums was in fact financed by fraudulent funds rather than by legitimate funds in the account. The Government's statement of material facts identifies only five months where the transactional sequence makes clear that Lee paid the monthly premium from funds that had been fraudulently acquired by Lee from his investors. *See*

---

$1,081,55.08 were deposited into Lee, Jr.'s Citibank account (McCartney Decl. ¶ 5)." Doc. #48-2 at 8 (¶ 22). The statement is also contradicted later in claimant's briefing by her admission that "the only period that illegitimate funds were deposited *into* the Citibank account was between late 2011 and November 1, 2013." Doc. # 48-1 at 7.

Doc. #48-2 at 4-5 (¶ 12) (December 2012); *id.* at 5 (¶ 14) (May 2013); *id.* at 6 (¶ 16) (July 2013); *id.* at 7 (¶ 19) (February 2013); *id.* at 7 (¶ 21) (November 2013).

Shortly after Lee died and the life insurance proceeds were realized, the Government seized the remaining life insurance proceeds in the amount of $465,789.31. The Government eventually filed this civil forfeiture action against the proceeds in September 2015. Now the Government moves for summary judgment seeking forfeiture of the entire remaining amount of life insurance proceeds.[2]

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Civil forfeiture actions are *in rem* proceedings in which "[i]t is the property which is proceeded against, and . . . held guilty and condemned as though it were conscious instead of inanimate and insentient." *United States v. Contorini*, 692 F.3d 136, 146 (2d Cir. 2012) (quoting *Various Items of Personal Property v. United States*, 282 U.S. 577, 581 (1931)). The Government must demonstrate by a preponderance of the evidence that the defendant property is

---

[2] As noted above, the policy was issued in the amount of $1 million. While still alive in 2014, Lee accelerated half of his death benefit under the policy, and the Government has previously seized and forfeited these proceeds without objection or contest. Doc. #48-2 at 11-12 (¶¶ 41-43).

4

subject to forfeiture. 18 U.S.C. § 983(c); *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 86 (2d Cir. 2016).

The Government's amended complaint alleges that the life insurance proceeds are forfeitable property on two grounds. First, the Government alleges that the proceeds are property that was "involved in a transaction or attempted transaction in violation of" federal money laundering laws "or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A). Second, the Government alleges that the life insurance proceeds are property that "constitutes or is derived from proceeds traceable to a violation" of the wire fraud statute. 18 U.S.C. § 981(a)(1)(C).

*Money Laundering Forfeiture – 18 U.S.C. § 981(a)(1)(A)*

I will first consider the Government's argument for a money-laundering basis for forfeiture: that the life insurance proceeds are property that was "involved in a transaction or attempted transaction in violation of" federal money laundering laws "or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A). There are two potential money laundering laws at issue: 18 U.S.C. § 1956 and 18 U.S.C. § 1957. A conviction for money laundering under 18 U.S.C. §1956 requires proof of a monetary transactions in criminally derived funds that is intended either to *promote* the underlying activity or to *conceal* the source, ownership, or control of the proceeds of the underlying criminal activity. *See, e.g.*, *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (quoting 18 U.S.C. §§ 1956(a)(1)(A)(i) & 1956(a)(1)(B)(i)).

As an initial matter, there is no evidence that any of the premium payments themselves were intended either to promote Lee's wire fraud or to conceal the source, ownership, or control of the funds. Therefore, for the purposes of the Government's summary judgment motion, a

genuine fact issue remains whether the premium payments themselves were monetary transactions that violated 18 U.S.C. § 1956.

The next consideration is whether any of the premium payments were otherwise "traceable" to property that was involved in a monetary transaction violating 18 U.S.C. § 1956. "[P]roperty 'traceable to' means property . . . the acquisition [of which] is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998).

This traceability inquiry requires me to consider the nature of transactions that occurred in the Citibank account, including not only those transactions involving *receipt* of fraudulently procured investor funds but also those transactions involving *disbursement* of investor monies to other investors in support of the Ponzi scheme. As to the receipt of fraudulently procured investor money from December 2011 to October 2013, a genuine fact issue remains whether these transactions amounted to money laundering. Doubt remains about whether Lee's intent upon receiving the investor funds was to use them to promote a continuing fraud (as opposed to Lee's harvesting and enriching himself from fraud) or for the purpose of concealing the source, ownership, or control of the fraud proceeds. Lee's intent is reasonably debatable.

The Government correctly notes that money laundering may occur if criminal funds are commingled with legitimate funds in order to facilitate or conceal a fraud scheme. But the evidence here does not incontrovertibly show that Lee acted with the scienter required for a money laundering conviction under § 1956 when he mixed fraudulently procured funds with legitimate funds in his Citibank account. "[T]he mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." *See Bornfield*, 145 F.3d at 1135. The "more" is evidence of an intent to

6

commingle the funds as part of a plan either to promote unlawful activity or to conceal the source, ownership, or control of unlawful funds. *See also United States v. Coffman*, 859 F. Supp. 2d 871, 876 (E.D. Ky. 2012) (discussing how comingling of tainted and untainted funds does not necessarily mean that the comingling is accompanied by an intent to promote/facilitate or conceal in violation of 18 U.S.C. § 1956). Therefore, a genuine fact issue remains as to the traceability of the premium payments to any money laundering transactions under 18 U.S.C. §1956 involving the receipt of fraudulently procured funds into the Citibank account.

As to the more than $1 million that Lee paid out from the Citibank account from December 2011 to April 2014, it seems clear that these transactions were done to promote the underlying fraud—that is, to "prime" Lee's Ponzi-scheme investors so they would entrust him with yet more of their money. *See, e.g.*, *United States v. Moloney*, 287 F.3d 236, 242 (2d Cir. 2002); *United States v. Mullens*, 65 F.3d 1560, 1564-65 (11th Cir. 1995). But these transactions were pay-*outs*, not pay-*ins*, such that it cannot be said that any of the insurance premiums that were paid by Lee from the same Citibank account were necessarily "traceable" to such paid-out property that had left the Citibank account.

All in all, there is no undisputed basis for me to conclude that any of the life insurance premiums either constituted or were traceable to money laundering transactions in violation of 18 U.S.C. § 1956. A genuine fact issue remains on this issue.

As to the second money laundering statute, 18 U.S.C. § 1957, this provision prohibits any person from knowingly engaging in a monetary transaction of more than $10,000 involving criminally derived funds. *See United States v. Silver*, 864 F.3d 102, 114 (2d Cir. 2017) (discussing statute), *cert. denied,* 138 S. Ct. 738 (2018). None of the policy premiums themselves exceeded $10,000, so these transactions cannot qualify as a violation of § 1957. On the other

7

hand, as noted above, the Government has identified at least five of the monthly premiums that were paid from victim funds deposited into the Citibank account, and in each of these five instances the premium was financed from a prior deposit into the account of more than $10,000 of victim funds. *See* Doc. #48-2 at 4-5 (¶ 12) (December 2012); *id.* at 5 (¶ 14) (May 2013); *id.* at 6 (¶ 16) (July 2013); *id.* at 7 (¶ 19) (February 2013); *id.* at 7 (¶ 21) (November 2013). Therefore, as to these five premium payments, the premium payments were traceable to a violation of § 1957. Genuine fact issues remain, however, about whether any of the other policy premiums are traceable to transactions in violation of 18 U.S.C. § 1957.[3]

In short, apart from the portion of the life insurance proceeds that is attributable to the five months of policy premiums that were financed by monetary transactions in violation of 18 U.S.C. § 1957, I conclude that genuine fact issues remains for trial concerning whether any additional amount of the life insurance proceeds are traceable to any violations of the federal money laundering laws. Accordingly, I will grant in part and deny in part the Government's motion for summary judgment on grounds of money laundering forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

*Wire Fraud Forfeiture – 18 U.S.C. § 981(a)(1)(A)*

I now consider the Government's argument for a wire fraud basis for forfeiture—that the life insurance proceeds are property that "constitutes or is derived from proceeds traceable to a violation" of the wire fraud statute. 18 U.S.C. § 981(a)(1)(C). As noted above, the Government's

---

[3] As the Government notes, the Second Circuit in *Silver* ruled "that the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957." 864 F.3d at 115. But here my task is not to decide what § 1957 requires but to determine whether funds are "traceable" to a violation of § 1957, as § 981(a)(1)(A) requires. Nor does the Government cite or apparently rely on a separate statutory forfeiture provision, 18 U.S.C. §983(d), which relaxes traceability requirements if the Government has filed its forfeiture action within one year of the underlying offense. *See* 18 U.S.C. §984(b); *United States v. Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, 2015 WL 3604044, at *4 (E.D.N.Y. 2015). The Government filed this forfeiture action in September 2015, more than one year after the end of Lee's wire fraud scheme in April 2014.

8

statement of material facts shows that only *some* of the monthly policy premiums were derived from or traceable to wire fraud. About half of Lee's policy premiums were paid from April 2008 to November 2011, all before the Citibank account ever received fraudulently procured funds. Moreover, the fraud activity ended at the latest when the FBI searched Lee's home in April 2014, and from that time onward Lee kept paying premiums for the policy from a different and untainted bank account until he died in April 2015.

That leaves for consideration only the policy premiums that Lee made during the time period of 29 months from December 2011 to April 2014 when the fraud was in full swing and the account replete with fraudulently procured funds. It may be that all or some of the life insurance premium payments "derived from proceeds traceable to a violation" of the wire fraud statute, just as § 981(a)(1)(C) requires. But, as noted above, the Government's statement of undisputed facts identifies only five months of premiums that were funded by fraudulently procured investor funds. Genuine issues remain about any of the remaining 24 months from December 2011 to April 2014.

Therefore, I will grant in part the Government's motion for summary judgment to the extent that it relies on the five months of policy premiums that were financed by wire fraud proceeds. I will otherwise deny the Government's motion for summary judgment to the extent that it seeks forfeiture of life insurance proceeds attributable to any time periods other than these five months.

### *Forfeiture applicability to life insurance proceeds and measurement*

Claimant argues that the contractual and contingent nature of an insurance policy somehow prevents application of the federal forfeiture laws. Doc. #48-1 at 13-14. I do not agree. What matters is that the right to the life insurance benefit was paid for in part with property

subject to forfeiture. The fact that a life insurance benefit happens to be contingent on the death of the policyholder or terminable upon non-payment of premiums does not mean that the chain of "traceability" is broken if the policy has in fact been funded by tainted money. *See United States v. Real Prop. Described in Deeds Recorded at Book/Page 839/846, 639/840, 639/834, 639/827 & 610/727 Henderson Cty. Registry & Ins. Proceeds*, 962 F. Supp. 734, 739 (W.D.N.C. 1997) ("Because that [residence] parcel is forfeited, any insurance proceeds stemming from the fire which destroyed that home would also be forfeitable.").

An additional question is whether any forfeiture should be determined by reference to what Lee paid in tainted premiums or to the value of the life insurance benefit. The answer is clear: If a criminal uses tainted money to buy an asset that appreciates in value, forfeiture properly attaches to the appreciated value of the asset, not simply to the outlay spent to buy the asset. *See United States v. Betancourt*, 422 F.3d 240, 252 (5th Cir.2005) ($5.4 million in lottery winnings subject to criminal forfeiture based on purchase of lottery ticket with proceeds from drug dealing). A contrary rule would encourage criminals to invest or gamble ill-gotten gains, secure in the knowledge that their investment or gambling gains would be subject to forfeiture only for the amount that they paid in. Accordingly, I conclude that the measure of forfeiture should be by reference to the value of the life insurance proceeds rather than by reference to the lesser value of the premiums paid to qualify for these proceeds.

Still, the record here makes clear that the Government is not entitled to the *entire* proceeds of the life insurance policy, because the Government has established at best that only a portion of the premium payments were derived from tainted funds. In cases where a particular investment is funded in part with tainted funds and in part with legitimate funds, courts subject only that proportional part of the investment to forfeiture. For example, in *United States v.*

*Tartaglione*, 2018 WL 1740532, at *29 (E.D. Pa. 2018)*,* the court concluded that "[w]here criminal proceeds are used to purchase or renovate a property, the Government is entitled to forfeiture of the proportion of the property traceable to criminal proceeds, including appreciation on that proportion." *Id.* at *28. Thus, in *Tartaglione*, the defendant/claimant spent about $1.2 million of "clean" money on real property but also spent about $600,000 of crime proceeds to improve it, and the court concluded that the Government was entitled by forfeiture to the proportional percentage of the real property's appreciated market value ($3 million) that was attributable to the unlawful proceeds that defendant invested. *Id.* at *29; *see also United States v. Loe*, 49 F. Supp. 2d 514, 522-23 (E.D. Tex. 1999); *United States v. One Parcel of Real Property Known as 352 Northup St.*, 40 F. Supp. 2d 74, 78 (D.R.I. 1999).

In light of this proportionality principle, I conclude that the Government is not entitled to the entire corpus of the life insurance proceeds. Instead, the Government is entitled only to the proportion of the life insurance proceeds that corresponds to the ratio of the value of policy premiums paid that were traceable to money laundering or wire fraud transactions (the numerator) to the total value of all policy premiums paid (the denominator). So, for example, if the Government were able to show that 25% of the total value of premium payments were traceable to wire fraud or money laundering transactions, then the Government would be entitled to 25% of the life insurance proceeds.

At this point, the Government has established only that five months of policy premiums are traceable to money laundering or wire fraud transactions—five months within seven years of payment of policy premiums. For those months when the Citibank account had no unlawful funds or money laundering transactions (April 2008 to November 2011 and May 2014 to April 2015), the Government has no rightful claim to life insurance proceeds that correspond to those

11

time periods. Lastly, for those months when the Citibank account contained wire fraud funds (December 2011 to April 2014), a genuine issue of fact remains for trial whether the premium payments for any additional months beyond the five months established so far are traceable to money laundering or wire fraud transactions. The specific method for determining traceability of otherwise fungible money also remains for resolution at trial. *See United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-60 (2d Cir. 1986) (discussing alternative methodologies).

## CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part the Government's motion for summary judgment. In light of undisputed facts showing that five months of policy premiums were financed by tainted funds, the Court GRANTS summary judgment for the amount of the life insurance proceeds that is proportional to five months of premium payments as divided by the entire amount of premium payments over the seven years of payments from April 2008 to April 2015. The Court otherwise DENIES summary judgment in light of genuine issues of fact remaining for trial about whether any other monthly policy premiums are traceable to acts of money laundering or wire fraud.

In light of the findings and guidelines set forth in this ruling, the parties are hereby REFERRED to Magistrate Judge Robert M. Spector for a settlement conference. In the event that the parties are unable to reach a settlement, the parties should contact chambers for entry of a pre-trial scheduling order and dates for trial.

It is so ordered.

Dated at New Haven this 24th day of September 2018.

                                              /s/ *Jeffrey Alker Meyer*
                                              Jeffrey Alker Meyer
                                              United States District Judge